FILED

AUG 24 2022

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | I N F O R M A T I O N |
| ) | |
| Plaintiff, ) | |
| ) | 1 : 22 CR 486 |
| v. ) | CASE NO. _____ |
| ) | Title 18, United States Code, |
| CULLEN FISCHEL, ) | Section 371 |
| ) | |
| Defendant. ) | **JUDGE BRENNAN** |

GENERAL ALLEGATIONS

At all times relevant to this Information, unless otherwise specified:

The Defendant and Related Entities and Individuals

1. Defendant CULLEN FISCHEL was a resident of Cuyahoga County, Ohio. Defendant was an employee of Company A from May 2015 through December 2019 and held various titles, including Marketing Manager (May 2015 through May 2016), Director of Business Development (May 2016 through June 2018), Wealth Management Advisor (June 2018 through December 2019, and Chief Operating Officer (January 2019 through December 2019). Defendant provided services to Company A as an independent consultant from January 2020 through August 2020.

2. Individual A was an attorney who resided in Florida. Individual A represented to Defendant that Individual A had the following licenses and accreditations, among others: Certified Public Accountant, Master of Business Administration, and certified valuation appraiser.

3. Individual B was a resident of Cuyahoga County, Ohio. Individual B was the President and Chief Executive Officer of Company A.

4. Company A was a financial planning firm located in Cuyahoga County, Ohio. Individual B established Company A in 1977.

5. Charity 1 was a non-profit entity Individual B established in 2016 at the direction of Individual A. Individual B and Defendant served as Charity 1's President and Vice President, respectively. At the request and direction of Individual B, Defendant became the Vice President of Charity 1.

6. Charity 2 was a non-profit entity controlled by Individual A.

7. On or about April 3, 2018, the United States filed a Complaint for Permanent Injunction and Other Relief against Individual A in the United States District Court for the Southern District of Florida (the "Injunction Suit") seeking to enjoin Individual A from, among other things, promoting and organizing an illegal charitable contribution scheme that claimed clients could obtain charitable contribution deductions on their tax returns but retain control and use over the assets donated. On or about April 26, 2019, the District Court entered a permanent injunction against Individual A that, among other things, enjoined Individual A from promoting and organizing the charitable contribution scheme.

COUNT 1
(Conspiracy to Defraud the United States, 18 U.S.C. § 371)

The First Assistant United States Attorney charges:

8. The allegations contained in paragraphs 1 through 7 of this Information are incorporated by reference as if stated fully herein.

### The Conspiracy and Scheme to Defraud

9. From in or around May 2015, and continuing through in or around August 2020, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant CULLEN FISCHEL, Individual A, Individual B, and others, did unlawfully, voluntarily, intentionally, and knowingly conspire, combine, confederate, and agree together and with each other, and with other individuals known and unknown to the First Assistant United States Attorney, to defraud the United States by impeding, impairing, obstructing, and defeating the lawful Government functions of the Internal Revenue Service of the Department of the Treasury in the ascertainment, computation, assessment, and collection of the revenue, namely, income taxes.

### Manner and Means of the Scheme

10. The manner and means by which Defendant and his co-conspirators carried out the scheme included, but were not limited to, the following:

*The Transaction*

11. Individual A promoted an illegal charitable contribution transaction ("Transaction") as a way for high-income clients to obtain a charitable contribution deduction on their tax returns but retain control and use over the assets donated.

12. Each Transaction involved the following steps:

    a. A limited liability company (an "Entity") was formed;

    b. A client transferred property, such as cash, securities, promissory notes, real estate, or other business interests, to the Entity in exchange for 100% ownership interest in the Entity;

    c. The client assigned 100% ownership interest in the Entity to a charity controlled by the co-conspirators (a "Charity"), such as Charities 1 and 2;

  d. The client was required to execute and sign an LLC agreement, a document issuing LLC units from the Entity to the client (an "issuance document"), and an assignment document assigning the LLC units to a charity (an "assignment document");

  e. In exchange for the assignment to the Charity, the client received an Internal Revenue Service Form 8283 ("Noncash Charitable Contributions"), signed by Individual A as an appraiser and signed by a representative of the Charity; and

  f. Based on the Form 8283, the client claimed a charitable contribution deduction on their federal tax return in the amount of the value of the Entity interest purportedly transferred, gifted, or donated to the Charity.

13. Individual A, Individual B, and Defendant marketed the Transaction as allowing the clients, as managers of the Entities, to retain complete dominion and control over their Entities and their Entities' assets. Clients had unfettered access to their assets inside the Entities through tax-free loans that were payable only upon the death of a client. The Charities had no control on how the clients managed the Entities. In practice, only a small fraction of the funds sent through the Transaction were directed to actual charitable purposes.

14. Individual A, Individual B, and Defendant marketed the Transaction as not only permitting a charitable contribution deduction, but also allowing a client to grow assets tax-free within the Entities and to pass on the assets in the Entities to the client's heirs without paying any estate taxes.

15. Individual A and Individual B trained Defendant on how to market and promote the Transaction to clients and how to implement the Transaction.

16. Defendant did not use the Transaction for his personal finances.

*Illegal Backdating*

17. Defendant, Individual A, Individual B, and other co-conspirators illegally backdated documents to assist participants in claiming deductions after the close of a tax year, avoiding the rule that a taxpayer may not claim a charitable-contribution tax deduction unless he or she made the charitable contribution in the taxable year.

18. To backdate purported charitable contributions, Defendant, Individual A, Individual B, and other co-conspirators offered preexisting Entities (sometimes referred to as "Shelf LLCs"), which Individual A had created and formed at the end of the prior year for clients to use.

19. Defendant, Individual A, and Individual B prepared documents related to the Transaction to give the appearance that the charitable contributions occurred within the taxable year, when the transaction actually occurred in the subsequent year.

20. In an effort to substantiate the Transactions entered into by their clients, Defendant, Individual A, Individual B, and others assisted clients in submitting backdated documents—including issuance documents, assignment documents, and promissory notes—in response to civil subpoenas that the United States issued in the Injunction Suit.

Overt Acts

21. In furtherance of the conspiracy, and to accomplish its object and purpose, at least one of the co-conspirators committed and caused to be committed, in the Northern District of Ohio, and elsewhere, at least one of the following overt acts, among others:

*Client 1*

22. On or about August 30, 2017, Defendant sent an e-mail to Client 1 and her husband, advising that they could implement the Transaction for the 2016 tax year, by stating: "We estimate that your tax bill on this amount may be approximately $530,000+. We are able to implement a

plan for you that can provide you with an approximate $640,000 tax deduction, which could put many tax dollars back in your pocket, rather than giving them up forever."

23. On or about September 12, 2017, Defendant sent an e-mail attaching documents to Client 1, including engagement agreements with Company A and Individual A.

24. On or about September 13, 2017, Defendant sent an e-mail to Individual A advising Individual A that Client 1 and her husband intended to execute the Transaction for tax year 2016: "[The husband] would like to contribute $800,000 to a new LLC for 2016. He will sign a promissory note. I assume you have an old LLC that can be used."

25. On or about September 15, 2017, Defendant and Individual B had a telephone call with Client 1 in which Defendant described the mechanics of the Transaction and the various tax benefits, as follows:

> [Y]ou have control over this LLC, which means that you can invest money however you'd like with – within this LLC. You can – you can also take money from this LLC, if you'd like. It's your LLC, you control it. It's kind of like a bank. But anytime you put money into your LLC or an account titled to your LLC, you get a tax deduction and we'll help you – we'll help provide that tax form to you so that you can claim that tax deduction on your personal tax returns.

26. On or about September 18, 2017, Individual A sent an e-mail to Defendant, Individual B, and another Company A employee that attached an LLC agreement, an issuance document, an assignment document, and other documents that Individual A requested Client 1 to sign and attached an appraisal report for the gift. All of the attachments were backdated to make it appear that the Transaction occurred in 2016.

27. On or about October 4, 2017, Defendant sent an e-mail to Client 1's accountant that attached a Form 8283 falsely stating that Client 1 made a charitable contribution of LLC units to Charity 1 on December 31, 2016, valued at $640,000, and a letter from Charity 1 falsely stating

6

that Client 1 made the donation in 2016. Individual A signed the Form 8283 as the appraiser and Individual B signed the Form 8283 as the representative of Charity 1.

28. In response to questions by Client 1's accountant, on or about October 5, 2017, Defendant sent an e-mail to Client 1's accountant that attached an executed Promissory Note that falsely represented that Client 1 and her husband entered into an agreement to pay their Entity $800,000 on December 31, 2016. The false date on the Promissory Note was designed to make it appear to Client 1's accountant that the Transaction occurred in 2016, when the Promissory Note had actually been signed on or about October 5, 2017.

29. Based on the false Form 8283, false Promissory Note, and other backdated Transaction documents provided by Defendant, on or about October 16, 2017, Client 1's accountant prepared and filed a false 2016 Form 1040 ("U.S. Individual Income Tax Return") claiming a $640,800 charitable contribution tax deduction. Defendant knew that the tax return was false as to a material matter in that the charitable contribution did not occur in 2016.

*Client 2*

30. On or about June 8, 2017, Defendant promoted the Transaction to Client 2 in a telephone call, explaining that he could assist Client 2 in claiming a charitable contribution tax deduction for tax year 2016 by utilizing a Shelf LLC:

> The way that the contributions works [sic] is we set up LLCs in 2016, you would use one of those LLCs. And, excuse me, and the way that it would be funded would be through a promissory note that's dated in 2016. And that would be for whatever contribution, let's say $250,000, and that would be your contribution for 2016. You'd get a tax deduction based off on that, the deduction would be approximately $200,000 for 2016, and when you file your 2016 tax return, you would include a Form 8283 that would give you that deduction, and you would probably get a refund of, maybe $80,000 or so from the federal government.
>
> . . .

7

> So you're basically – again you're putting money from one pocket to another pocket.

31. On or about June 8, 2017, Defendant sent an e-mail to Individual A asking if Individual A had "any LLCs established in 2016." After Individual A confirmed that he did, Defendant responded that Client 2 "wants to do this for 2016" and that Defendant and another employee of Company A "just signed him up a minute ago."

32. On or about June 19, 2017, Defendant sent an e-mail to Individual A, with a copy to Individual B and another employee of Company A, stating that Defendant was attaching a "signed engagement agreement and information sheet for a client, [Client 2]."

33. On or about July 18, 2017, Defendant sent an e-mail to Individual A that attached Transaction documents signed by Client 2, including an LLC agreement, issuance document, assignment document, and promissory note. The signed documents attached to the e-mail were all backdated to December 2016 to make it appear that the Transaction occurred in 2016.

34. On or about August 2, 2017, Defendant sent an e-mail to Client 2's accountant, stating, "The value of the allowed deduction is $200,250 and was made on 12/30/2016. Please enter this charitable deduction into his year 2016 Form 1040 and attach a copy of this form to his return when it is filed." Attached to the e-mail was a Form 8283 that falsely stated that Client 2 made a charitable contribution of LLC units to Charity 1 on December 31, 2016, valued at $200,250. Individual A signed the Form 8283 as the appraiser and Individual B signed the Form 8283 as the representative of Charity 1.

35. On or about August 10, 2017, Defendant sent an e-mail to Client 2's accountant that contained a slightly different version of the Form 8283 with the same false information contained in the Form 8283 sent on or about August 2, 2017.

36. Based on the false Form 8283 and other backdated Transaction documents provided by Defendant, on or about August 23, 2017, Client 2's accountant prepared and filed a false 2016 Form 1040 ("U.S. Individual Income Tax Return") claiming a $200,250 charitable contribution tax deduction. Defendant knew that the tax return was false as to a material matter in that the charitable contribution did not occur in 2016.

*Client 3*

37. Client 3 claimed charitable contribution tax deductions resulting from the Transaction for tax years 2015, 2016, and 2017. In 2016 and 2017, Client 3 did not execute issuance or assignment documents for the Transactions. Without the issuance and assignment documents, there was no charitable contribution to the charity.

38. On or about August 22, 2018, in connection with the Injunction Suit, the United States issued a subpoena to Client 3 (the "Client 3 Subpoena") requesting him to produce documents.

39. In or around September 2018, Defendant, Individual A, and Individual B assisted Client 3 in submitting false documents to the United States in response to the Client 3 Subpoena. At the direction of Individual A and Individual B, Defendant provided Client 3 with unsigned copies of issuance and assignment documents for Client 3 to sign to substantiate deductions that Client 3 claimed on his personal income tax returns for tax years 2016 and 2017. The issuance and assignment documents provided by Defendant were backdated to December 2016 and 2017.

40. In or around September 2018, following Defendant's instructions, Client 3 signed the backdated issuance and assignment documents and provided them in response to the Client 3 Subpoena.

*Client 4*

41. In 2016, Client 4 and his wife, who had claimed charitable contribution tax deductions resulting from the Transaction for tax years 2012 through 2015, used approximately $92,439 from their Entity to pay for personal expenses, including purchasing personal vehicles, without executing any promissory notes with their Entity.

42. On or about January 4, 2017, Defendant sent an e-mail to Client 4 and his wife telling them they could not withdraw money from their Entity without a promissory note, stating, "To do this, you enter into a promissory note for each loan you take and write the check to yourself. If your LLC were to be audited, your practice of writing checks to pay for personal items not related to the LLC from the LLC's account may not pass muster, and your previous deductions may be denied."

43. On or about January 5, 2017, at the direction, and with the approval, of Individual A and Individual B, Defendant sent an e-mail to Client 4 and his wife relaying Individual A's offer to purchase back their interest in the Entity from Charity 2 for $10,000, stating "***Obviously, this would be a windfall for you both.*** You will have been granted $764,350 of tax deductions, tax free growth, etc. and will be able to regain complete ownership over your money for approximately 1.3% of the total amount currently in the LLC."

44. On or about February 16, 2017, Client 4 sent an e-mail to Defendant, with a copy to Individual A, and Individual B, that attached a signed Settlement Agreement and Mutual Release in which Client 4 and his wife purchased back their interest in their Entity for $10,000. The settlement agreement was eventually signed by Client 4, Client 4's wife, Individual A, Individual B, and Individual A as the representative of Charity 2.

45. On or about March 2, 2017, Client 4 paid $10,000 to Charity 2.

46. On or about May 23, 2018, in connection with the Injunction Suit, the United States issued a subpoena to Client 4 (the "Client 4 Subpoena") requesting him to produce documents.

47. In or around August and September 2018, Defendant, Individual A, and Individual B assisted Client 4 in submitting false documents to the United States in response to the Client 4 Subpoena. Defendant, at the direction of Individual A and Individual B, provided Client 4 with unsigned copies of issuance and assignment documents for Client 4 to sign to substantiate deductions that Client 4 claimed on his personal income tax returns for tax years 2013 through 2015. The issuance and assignment documents provided by Defendant were falsely backdated.

48. In or around September 2018, Client 4 provided documents in response to the Client 4 Subpoena, including backdated Promissory Notes, issuance and assignment documents, and an attorney engagement agreement.

All in violation of Title 18, United States Code, Section 371.

MICHELLE M. BAEPPLER
First Assistant United States Attorney

By: _____
MICHAEL L. COLLYER
Chief, White Collar Crime Unit

By: _____
MICHAEL C. BOTELER
Assistant Chief, Tax Division, Southern
Criminal Enforcement Section